UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X
                                       :        12cv5459 (DLC)
FAISAL SAMAD, SAVAR TEXTILES LTD., and :
SUPASOX LTD.,                          :        OPINION AND ORDER
                          Plaintiffs,  :
                                       :
             -v-                       :
                                       :
CRAIG GOLDBERG and ERIC BRESLOW        :
                                       :
                          Defendants.  :
-------------------------------------- X

Appearances:

For Plaintiffs:
Ahmed A. Massoud
Massoud & Pashkoff, LLP
1700 Broadway, 41st Floor
New York, NY 10016

For Defendants:
Steven A. Soulios
Ruta, Soulios & Stratis LLP
370 Lexington Avenue, 24th Floor
New York, NY 10017

DENISE COTE, District Judge:

     This action arises from a dispute between plaintiffs Faisal
Samad ("Samad"), Savar Textiles Limited ("Savar") and Supasox
Limited ("Supasox"), and defendants Craig Goldberg ("Goldberg")
and Eric Breslow ("Breslow").  The plaintiffs allege a claim of
unjust enrichment against Goldberg and Breslow for failing to
remit funds that were owed to Savar.  A bench trial was held on
this claim on November 10, 2016.  This Opinion presents the
Court's findings of fact and concludes that it was the

defendants' company Ryan & Jane Limited ("R&J") that owed money to Savar, that the plaintiffs have not shown that Goldberg and Breslow may be held individually liable for that corporate debt, and that a contract governed the transaction at issue in this case, thereby precluding recovery under a theory of unjust enrichment.

## PROCEDURAL HISTORY

Samad is a citizen and current resident of Bangladesh.  He is the President and owner of co-plaintiffs Savar and Supasox. Savar and Supasox manufacture apparel accessories in Bangladesh and export these products to the United States and other markets.

Goldberg and Breslow are both citizens of the United States and residents of New York.  Goldberg and Breslow are the founding principals of R&J, which was incorporated in New York on October 5, 2006.  R&J was primarily engaged in the wholesale distribution of men's hosiery to retailers such as Rite Aid Corporation ("Rite Aid") and Walmart.  Goldberg oversaw production, importation, and documentation of shipments, while Breslow was responsible for sales and product design.

In 2006, Samad contributed $100,000 in exchange for a 15% ownership interest in R&J.  The remaining ownership interest was divided equally between Goldberg and Breslow.  As an accommodation to the new venture, Samad agreed to have Savar and

Supasox serve as suppliers for R&J, with payment to Samad's companies to be deferred for a period of 75 days.

On July 16, 2012, the plaintiffs filed a complaint ("July 2012 complaint") asserting various claims for relief against Goldberg, Breslow, R&J, and Weisner Products Inc. ("Weisner"), as well as Rite Aid and TD Bank, N.A. ("TD Bank").[1]  The complaint asserted, <u>inter alia</u>, that R&J had failed to pay Savar and Supasox for several shipments of goods.  Despite these outstanding debts, Goldberg and Breslow entered into an agreement in August 2010 to sell all of R&J's assets (including its inventory of Savar and Supasox merchandise) to Weisner.

The plaintiffs asserted a veil piercing and alter ego theory of liability against Goldberg and Breslow in an attempt to hold them individually liable for R&J's debts.  The July 2012 complaint also alleged breaches of fiduciary duty against Goldberg and Breslow.  Finally, the plaintiffs asserted that the sale to Weisner was a fraudulent transfer in violation of §§

---

[1] All claims against TD Bank were voluntarily dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A) on November 28, 2012.  Rite Aid filed its answer and cross-claims against R&J and Weisner on October 12, 2012.  All claims against Rite Aid were voluntarily dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A) on April 23, 2013.  On May 6, 2013, Rite Aid voluntarily dismissed its cross-claims against R&J and Weisner with prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A) and 41(c).

273, 274, and 276 of the New York Debtor & Creditor Law ("N.Y. Debt. & Cred. Law").

On July 3, 2013, the motion by Goldberg and Breslow to dismiss all claims against them was denied.  Discovery having been completed, the Pretrial Order was scheduled to be filed on July 26, 2013.  One day earlier, on July 25, 2013, R&J filed a Chapter 7 Petition for bankruptcy in the United States Bankruptcy Court for the Southern District of New York.  A stay was entered in this case on August 2, 2013 pursuant to 11 U.S.C. § 362(a).

On August 21, 2014, the Trustee of the R&J estate commenced an adversary proceeding against Weisner, seeking inter alia, to avoid the conveyance of R&J's property (the "Trustee Action"). The Trustee Action was amended on September 30 to include Goldberg and Breslow as defendants.

Prior to the commencement of the Trustee Action, on April 25, 2014, Samad filed a motion for relief from the automatic stay entered in the bankruptcy case to allow the plaintiffs to continue their action against, inter alia, R&J.  At a September 23, 2014 hearing on this motion, the bankruptcy court invited Samad to make an STN motion.[2]  An STN motion was never made;

---

[2] In In re STN Enterprises, 779 F.2d 901 (2d Cir. 1985), the Second Circuit held that there is a "qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court."  Id. at 904.  The STN standing inquiry

accordingly, Samad's motion for relief was denied on October 28, 2014.

On December 15, 2015, the bankruptcy court entered an order approving a stipulation of settlement between the Trustee and Goldberg and Breslow (the "Settlement Agreement").  The settlement released all claims by the bankruptcy estate against Goldberg and Breslow, including claims for unjust enrichment. The Settlement Agreement provided that:

> [T]he Trustee and the Debtor's estate . . . shall be deemed to have released and discharged the Defendants . . . from any and all actions, causes of action, claims, suits . . . arising prior to the execution of this Stipulation, including but not limited to claims for breach of fiduciary duty, piercing the corporate veil, alter ego, fraudulent conveyance, conversion, unjust enrichment, fraud and claims arising under the New York Business Corporation Law and/or the New York Debtor and Creditor Law.

The plaintiffs did not object to the Settlement Agreement, nor did they appeal the bankruptcy court's order approving the Settlement Agreement.

On December 30, 2015, Goldberg and Breslow filed a motion to enforce the order approving the Settlement Agreement and to

---

requires a bankruptcy court to determine whether "the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery," and "to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action," by "examin[ing], on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate."  Id. at 905.

enjoin further litigation ("December 30 Motion").  This motion
was granted in part by the bankruptcy court on July 5, 2016
("July 2016 Opinion").  See In re Ryan and Jane Ltd., No. 14-
08253, 2016 WL 3742005 (Bankr. S.D.N.Y. July 5, 2016).  The
bankruptcy court held that the "Trustee's settlement with
[R&J's] Principals -- and the Court's approval of that
settlement -- bar[red] the vast majority of the Pre-Petition
Plaintiffs' claims against [R&J's] Principals."  Id. at *4.  In
particular, the plaintiffs were barred from asserting their
claims for fraudulent conveyance, breaches of fiduciary duty,
corporate veil piercing, and alter ego liability, as such claims
belonged to the Trustee and were precluded by the Settlement
Agreement.  Id. at *4-*5.  The only claim not barred by the
Settlement Agreement was Count Four of the July 2012 Complaint -
- a claim for unjust enrichment against Goldberg and Breslow --
since, according to the bankruptcy court, Count Four is "unique
to the [plaintiffs] -- rather than merely a harm shared by all
creditors."[3]  Id. at *6.

_____

[3] The bankruptcy court also held that, "to the extent [Paragraphs
127 and 128 of Count Six of the July 2012 complaint] assert an
alternative theory for recovery of the funds at issue in Count
Four, such claim is preserved."  Id. at *6 n.3.  Paragraphs 127
and 128 allege that Goldberg and Breslow arranged for the
forgiveness by R&J of over $100,000 of Rite Aid's debt in
exchange for future Rite Aid orders from Weisner.  The
plaintiffs did not rely upon this theory for recovery at trial.

Count Four of the July 2012 complaint alleges that Savar sold products to Rite Aid for which its consignee, the Export Import Bank of Bangladesh Limited ("Exim Bank"), was never paid. Instead, this sum was paid to, and unlawfully retained by, R&J. The plaintiffs' original theory of individual liability alleged that R&J was the alter ego of Goldberg and Breslow, and that its corporate veil should be pierced to hold Goldberg and Breslow jointly and severally liable for R&J's debts. In light of the July 2016 Opinion, however, the plaintiffs may no longer assert corporate veil piercing or alter ego liability as theories for holding Goldberg and Breslow individually liable for R&J's debts.

On July 13, 2016, the bankruptcy stay was lifted in this case. At an August 25 conference, a bench trial was scheduled for November 10. Without objection from the parties, the trial was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony from witnesses through affidavits submitted with the pretrial order. The parties also served with the pretrial order copies of all exhibits that they intended to offer as evidence in chief at the trial.

The plaintiffs provided a declaration from Samad. The defendants provided declarations from Goldberg and Breslow. During the trial, the plaintiffs called Samad as a witness, and

the defendants cross examined him.  The defendants offered testimony from Goldberg and Breslow, who were both cross examined.[4]

This Opinion presents the Court's findings of fact and conclusions of law.  The findings of fact appear principally in the Background section.

**BACKGROUND**

Between 2006 and 2010, Samad's companies -- Savar and Supasox -- served as suppliers to R&J.  In a typical transaction involving a sale of goods by R&J to Rite Aid, R&J would secure a purchase order from Rite Aid, and would then arrange for either Savar, Supasox, or another entity to manufacture the merchandise and ship the goods to Rite Aid's distribution center in the United States.  Rite Aid would pay R&J for the goods, and R&J was in return under an obligation to pay Samad's companies.  By the beginning of 2010, however, R&J owed something over $200,000 to Samad's companies for R&J orders it had filled.

The plaintiffs allege that the transaction at issue in this case -- a May 7, 2010 shipment to Rite Aid of 1,486 cases of

---

[4] At trial, the defendants were given leave to submit, by November 11, a declaration, from Jennifer Beatty ("Beatty"), a Rite Aid employee, on consent of all parties.  On November 11, the defendants filed a signed declaration that was not on consent, as well as a revised declaration that was on consent, but was not signed by Beatty.  Accordingly, this Opinion does not consider either of Beatty's declarations.

men's socks -- differed from the typical arrangement.  The plaintiffs sought to show that Rite Aid placed its order for those socks directly with Savar, rather than R&J.  For this transaction, Exim Bank served as Savar's consignee and plaintiffs contend that Rite Aid had a duty to pay Exim Bank before it could receive the goods.  Samad further asserts that he relied on the defendants' promise to immediately pay Savar what it was owed for the shipment when he granted Rite Aid permission to pay R&J instead.  Accordingly, the plaintiffs sought to prove at trial that Goldberg and Breslow were unjustly enriched because they failed to remit Rite Aid's payment to R&J to Savar.

As described below, the plaintiffs have failed to show that there was any contract between Rite Aid and Savar.  Rather, as was typical, Rite Aid placed the order with R&J and R&J placed an order with Savar.  After the quantity Rite Aid ordered was reduced, Savar shipped 1,486 cases of men's socks on May 7, 2010, and 459 more cases a short time later.  While Rite Aid paid R&J for these shipments, R&J never paid Savar for the 1,486 cases.  R&J owed Savar approximately $88,000 for this shipment as of the date this litigation commenced.  The evidence of these transactions is as follows.

**Negotiation of the April 2010 Rite Aid Purchase Order**

This transaction began on January 22, 2010, when Rite Aid issued Purchase Order Number 4756256 ("P.O. 4756256").  P.O. 4756256 lists R&J as the seller, Rite Aid as the consignee, Liss Global Inc. ("Liss Global") as the buyer's agent, and NYK Logistics (Americas) Inc. International ("NYK Logistics") as the logistics provider.  "Rite Aid EC Deconsolidation Center" in Chesapeake, Virginia is designated as the address for shipment, and the order is to be shipped via ocean, f.o.b. from Chittagong, Bangladesh (where Savar's factory is located), with delivery to the f.o.b. destination no later than April 11, 2010.[5] P.O. 4756256 is for 5,390 cases of socks, split evenly between men's and women's socks.

As of this time, R&J owed Samad over a hundred thousand dollars for goods Samad's companies had previously shipped to R&J customers and for Samad's initial investment in R&J.  A few weeks after P.O. 4756256 was placed, Samad informed Goldberg that he would not fill the full Rite Aid order.  As a result, Goldberg contracted with a Pakistani factory to supplement Savar as a supplier for Rite Aid P.O. 4756256.  On March 17, Goldberg sent an email to Ryan Bergstrom ("Bergstrom"), an account

---

[5] "F.O.B." or "Free on Board" means that title to the property passes from the seller to buyer at the designated FOB point. See Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841, 842 n.2 (2d Cir. 1985).

manager with Liss Global (Rite Aid's agent), informing him about the modifications to Rite Aid P.O. 4756256.

After Goldberg emailed Bergstrom the revised production schedule, Samad informed Goldberg that Savar would not meet the newly reduced production quantities.  Goldberg then contacted Rite Aid to have them issue a revised purchase order.  The revised Rite Aid P.O. 4756256, issued on March 23, 2010, reflects a reduction in quantity of merchandise from 5,390 cases to 3,445[6] cases of socks.  All but 750 cases were for men's socks.

Samad promptly told Goldberg on March 23 that he would not supply even the reduced amount ordered by Rite Aid and that he would also require any payment for goods he was going to produce to be made within 12 days, and not his customary 75 days.[7]  Given the large amount of money that R&J owed Samad's companies, Samad insisted on the shortened time for payment.  Accordingly, Goldberg prepared and issued R&J Purchase Order 700312 ("P.O. 700312") on March 23, 2010.  Goldberg emailed Samad R&J P.O. 700312 that afternoon.  P.O. 700312 lists Savar as the vendor and Rite Aid as the customer.  The order is scheduled to be shipped via ocean freight, f.o.b. Bangladesh, on April 10, 2010.

_____

[6] 3,445 cases is equivalent to 82,680 packs.

[7] Seventy-five days was a significantly longer term than the payment terms that governed other R&J suppliers.

According to the terms of the order, Savar was to be paid within 12 days of shipment.  P.O. 700312 reflects an order for 18,000 packs of women's socks and 56,304 packs of men's socks, which is less than the combined total of 82,680 packs called for by the March 23 version of Rite Aid P.O. 4756256.

Shortly after Rite Aid issued a revised P.O. 4756256 and R&J issued P.O. 700312, Samad once again informed Goldberg that he would not meet the production quantities set forth in the R&J P.O. 700312.  As a result, Goldberg reassigned the production of all women's socks listed on P.O. 700312, as well as approximately 10,000 of the 56,304 packs of men's socks, to the Pakistani factory.  This reduction is memorialized in a second revised Rite Aid P.O. 4756256, issued on April 5, 2010, which reflects an order for 1,945 cases (or 46,680 packs)[8] totaling $134,438.40 after adjustments.[9]  The April 5 version of P.O. 4756256 provides for a window for shipment from Chittagong, Bangladesh between April 2 and April 23, 2010.

---

[8] Each case contains 24 packs of socks, and each pack contains 10 pairs of socks.

[9] The goods reassigned to the Pakistani factory do not appear on the April 5 version of P.O. 4756256, since separate purchase orders are required for orders shipped from different countries.

**Documentation and Shipment of Rite Aid P.O. 4756256**

As of April 6, Savar had finished manufacturing 1,486 cases of men's socks for shipment to Rite Aid.  On April 6, Savar prepared a commercial invoice (the "Savar Commercial Invoice"). All shipment documentation prepared by Savar, including the commercial invoice, lists both Rite Aid P.O. 4756256 and R&J P.O. 700312, as well as sales contract number "STL/R&J-001/2010."  STL/R&J-001/2010 constituted the "master contract" between Savar and R&J for this shipment.  The consignee is identified as Exim Bank.

Savar used Exim Bank to finance its manufacturing costs for this shipment of socks; as a consequence, Exim Bank became the consignee and owner of the shipment.  Exim Bank required all documentation produced by Savar in connection with the shipment to contain the governing contract number, and thus Savar included the number for the R&J master contract on each of the relevant documents.

The Savar Commercial Invoice designates Rite Aid's "EC Deconsolidation Center" in Chesapeake, Virginia as the address for shipment, and lists the sailing date as May 7, 2010.  The invoice is only for 35,664 packs of socks,[10] rather than the

---

[10] 35,664 packs is equivalent to 1,486 cases of socks.

46,680 packs[11] provided for in the April 5 version of P.O.
4756256.  This is equivalent to 459 fewer cases of socks.  The
total cost of the goods shipped is $87,662.11.

On April 6, Savar also issued a packing list in conjunction
with its commercial invoice (the "Savar Packing List").  The
Savar Packing List is similarly only for 1,486 cases (or 35,664
packs) of socks.[12]

At some point, Goldberg prepared a revised production
schedule to reflect the quantity of goods to be shipped by Savar
pursuant to the April 5 version of Rite Aid P.O. 4756256.
According to the production schedule, Savar was scheduled to
ship 46,680 packs (or 1,945 cases) of men's socks.  The goods
were to arrive at the port in Bangladesh no later than April 16,
2010.

At some later point, Goldberg prepared a second revised
production schedule to reflect the division of Rite Aid P.O.
4756256 into two shipments: the first shipment for 36,000 packs
(or 1,500 cases) would ship from Bangladesh on April 11, while
the second shipment for 10,680 packs (or 445 cases) would ship
on April 23.  Thus, according to R&J's records, Savar was still
scheduled to ship a total of 46,680 packs of socks to Rite Aid,

---

[11] 46,680 packs is equivalent to 1,945 cases of socks.

[12] The document uses the term carton for the term case.  These
terms are interchangeable.

as designated in the April 5 version of the Rite Aid purchase order.

On May 1, R&J issued a commercial invoice to Rite Aid ("R&J Commercial Invoice").  It reflects a shipment from Savar of 1,486 cases of men's socks at an adjusted cost of $102,712.32. The expected shipment date from Chittagong, Bangladesh is listed as May 5.  Thus, the Savar Commercial Invoice and the R&J Commercial Invoice match in terms of quantity, but the R&J Commercial Invoice reflects a markup of approximately $15,000, and the date of shipment from Chittagong differs by two days.

On May 4, Savar prepared, and Exim Bank issued, a Bill of Exchange for $87,662.11, to be charged to the account of Rite Aid, drawn under the "Commercial Bank" located in Mount Laurel, New Jersey.  Commerce Bank -- not Commercial Bank -- was once located at the address provided for on the Bill of Exchange. Commerce Bank was ultimately acquired by TD Bank.  R&J's bank account is at that TD Bank branch.  Rite Aid does not make payments through TD Bank.  Rather, it uses TradeCard, an electronic payment system for international trade.

On May 5, NYK Logistics (Hong Kong) Limited in Dhaka, Bangladesh issued a Forwarder's Cargo Receipt, confirming that NYK Logistics had received 1,486 cases (or cartons) of men's socks from Savar on April 23 (the "Forwarder's Cargo Receipt"). The Forwarder's Cargo Receipt lists Exim Bank as the consignee,

15

and also references Rite Aid P.O. 4756256 and R&J P.O. 700312.
Chesapeake, Virginia is designated as the address for shipment.

On May 7, a Bill of Lading was issued.  The Bill of Lading
was signed by a representative from Badal and Company, a
Bangladeshi freighting company.  It indicated that the goods had
successfully shipped on board from Bangladesh on May 7, 2010,
and were destined to arrive in Norfolk, Virginia.  Savar is
listed as the supplier and Exim Bank as the consignee.  The
parties to be notified include Expeditors International (an
agent of Rite Aid), NYK Logistics (Rite Aid's logistics
provider), as well as Rite Aid itself.  Finally, the description
of goods is for 1,486 cartons, and references Rite Aid P.O.
4756256, R&J P.O. 700312, and the R&J contract STL/R&J-001/2010.

Also on May 7, a Certificate of Origin was issued by the
Metropolitan Chamber of Commerce and Industry in Dhaka
Bangladesh, certifying that the goods -- identified once again
as Rite Aid P.O. 4756256, R&J P.O. 700312, and STL/R&J-001/2010,
and consisting of 1,486 cases of men's socks -- had been
produced and manufactured in Bangladesh, and shipped to the
United States on or about May 7, 2010 (the "Certificate of
Origin").

In sum, Savar shipped 1,486 cases of men's socks from
Bangladesh to Rite Aid on May 7, 2010.  Rite Aid's most recent
purchase order, dated April 5, required the shipment of 1,945

16

cases of men's socks.  Within a short period of time, Savar completed the shipment of 1,945 cases by making a second shipment to Rite Aid, consisting of 459 cases.  R&J's only purchase order for this transaction, dated March 23, called for the shipment of 3,096 cases of men's and women's socks.  R&J's revised production schedules, however, reflected its understanding that only 1,945 cases would be shipped and that that order would be broken into two shipments.

**Problems with Savar's Shipment of Rite Aid P.O. 4756256**

Beginning on April 27, Liss Global began to inquire of R&J when it could expect the missing 459 cases of socks.  Liss Global had apparently learned from its NYK Logistics agents in Bangladesh that only 1,486 cases had been delivered to its warehouse.  On May 3, Liss Global reminded R&J that "the latest delivery date for PO# 4756256 is 5/4."  Liss Global asked Goldberg that he "ensure all the goods can be delivered to NYK by tomorrow."

On May 5, Goldberg sent an email to Liss Global and Rite Aid informing them that after "going somewhat ballistic to the factory owner in Bangladesh," he learned from the factory owner that the merchandise was not finished.  Goldberg went on to reassure Liss Global and Rite Aid that R&J had a production plan in place with the Bangladesh factory, and that R&J had "hired an outside agency to monitor the production and give us daily

reports on the [work in progress]."  Goldberg also provided a revised schedule to govern the remaining 459 cases from the P.O. 4756256 shipment: 225 cases would be sent to port on May 9, 2010 and arrive at Rite Aid's deconsolidation center in Virginia on June 20, 2010, while the remaining 234 cases would be sent to port on May 12, 2010 and arrive at the Rite Aid deconsolidation center on June 23, 2010.

Rite Aid refused to accept this proposed delivery schedule. Goldberg therefore offered a $1.00 per pack discount, meaning that "[t]he cost would go from $3.00 per pack to $2.00 on the merchandise itself . . . equat[ing] to a cost savings on the FOB value of $31,320."  On May 14, Rite Aid agreed to purchase the late-arriving socks at a discount provided that the merchandise arrived at Rite Aid's distribution centers, as opposed to its deconsolidation center, no later than June 15.

**Retrieving Savar's Shipment of Rite Aid P.O. 4756256**

At some point after May 7, R&J's TD Bank branch in Mount Laurel, New Jersey notified Goldberg that it had the commercial documents for the shipment and he retrieved the shipping documents from them.  Only two documents were required to release this shipment of goods to Rite Aid: the Forwarder's Cargo Receipt and the Bill of Lading.  Having retrieved both the required documents, along with the Savar Commercial Invoice, the Savar Packing List, the Certificate of Origin, and the Bill of

18

Exchange, Goldberg delivered the Cargo Receipt and Bill of Lading to Rite Aid.

On May 25, 2010, Rite Aid executed a wire transfer of $102,712.32 to R&J's account.[13]  This transfer matches the invoice total listed on the May 1 R&J Commercial Invoice.

On June 8, 2010, Samad sent an email to Breslow and Goldberg with the subject line: "i m sorry."  Samad apologized for "let[ting] [Goldberg and Breslow] down on the rite aid business," explaining that his credit had been stopped for "outstanding dues."  Samad then asked what Breslow and Goldberg were thinking about the Rite Aid payment, as he still had not received any.  On June 28, Goldberg reminded Samad that R&J owed Rite Aid a refund of $31,000 on a "second" shipment and had to give Rite Aid a $1 discount per pack on the late-delivered 459 cases of socks.

On June 29, 2010, R&J wrote a check for $31,000 to Rite Aid.  This $31,000 was, in turn, deducted from the payment R&J made to Savar for the "Rite Aid 2nd Shipment."  The "Rite Aid 2nd Shipment" was comprised of the 459 missing cases from P.O. 4756256 (the purchase order at issue in this case), as well as additional merchandise from a separate purchase order -- P.O.

---

[13] R&J's TD Bank Statement of Account reflects a credit of $102,594.61 on May 26, 2010.  There is a $117.71 discrepancy between the amount transferred and the amount received.

4756257.  The sub-total for the "Rite Aid 2nd Shipment" was $76,984.66.  After deducting $31,000, however, the total for the "Rite Aid 2nd Shipment" was $45,984.56, which was paid to Savar on July 8, 2010.  Thus, the $31,000 discount offered to Rite Aid as compensation for the delayed shipment of 459 cases was deducted from the payment made to Savar for the second shipment.[14]

**R&J's Failure to Pay Savar for the Shipment of Rite Aid P.O. 4756256**

It is undisputed that Savar was never paid $87,662.11 for its shipment of 1,486 cases to Rite Aid in fulfillment of P.O. 4756256.  Between June and October 2010, Samad corresponded with Goldberg and Breslow regarding this unpaid sum.  In an email dated September 2, 2010, Breslow acknowledged that R&J owed Samad "around $100,000" for prior merchandise.  Indeed, an "Accounts Payable Aging Summary" for R&J dated September 30, 2010 reflects a total sum of $266,976.38 owed to Savar.  On October 5, 2010, Samad sent Breslow and Goldberg an email requesting that a payment be made for $80,000, "one for Dhaka

---

[14] As detailed in an email from Samad to Goldberg and Breslow on June 28, 2010, Exim Bank refused to release the shipping documents to Rite Aid for the second shipment because they had never received payment for the first shipment -- the May 7 shipment of 1,486 cases.  Apparently, Samad authorized Exim Bank to release the documents for the second shipment after Goldberg promised that R&J would pay the money it received from Rite Aid.

bank and one for Exim bank," before October 15; otherwise, Samad would be "in deep s**t if I can't pay the bank pls I beg u help me."  Goldberg replied to this email on October 6, explaining that it would be impossible to wire $80,000 by October 15, as R&J had yet to receive the "closing transfer."

During 2010, Breslow and Goldberg continued to receive their salaries from R&J, albeit at a rate lower than had been paid to them in prior years.  They were also reimbursed for their business expenses.  The money that Rite Aid paid R&J went into its general business account.  R&J used its funds in 2010 to pay other suppliers, but never paid Samad the full amount it owed to his companies.  Beginning in mid-2010, Breslow and Goldberg asked if they could further delay or renegotiate payment to Samad as they explored a sale of R&J.  Samad refused.

## DISCUSSION

The only surviving cause of action in this case is the plaintiffs' claim for unjust enrichment against Goldberg and Breslow.  Before assessing the merits of the unjust enrichment claim, however, this Opinion analyzes whether Goldberg and Breslow may be held individually liable for R&J's failure to remit the funds owed to Savar.

## I. Individual Liability

As set forth in the bankruptcy court's July 2016 Opinion, the plaintiffs may not seek to hold Goldberg or Breslow

individually liable on a veil piercing or alter ego theory of liability.  The plaintiffs therefore propose an alternate theory of personal liability.  As the plaintiffs correctly assert, New York law[15] provides that "a corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced."  Peguero v. 601 Realty Corp., 873 N.Y.S.2d 17, 21 (N.Y. App. Div. 2009) (quoting Espinosa v. Rand, 806 N.Y.S.2d 186, 187 (N.Y. App. Div. 2005)).  One such tort for which corporate officers may be held liable is conversion.  See Replace Retail, LLC v. Universal Renovation USA, 2009 N.Y. Misc. LEXIS 5294, at *9 (N.Y. Sup. Ct. Sept. 14, 2009).  Conversion requires that "a defendant exercise[] unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted).  Thus, "[a]n action will lie . . . for conversion of money where there is an obligation to return or

---

[15] All parties rely on New York law in their discussions of the unjust enrichment claim.  This implied consent to using New York law "is sufficient to establish choice of law."  Santalucia v. Sebright Transp. Inc., 232 F.3d 293, 296 (2d Cir. 2000) (citation omitted).

otherwise treat in a particular manner the specific money in question."  Id.

The plaintiffs did not provide any evidence to suggest that Goldberg or Breslow converted funds owed to the plaintiffs. Moreover, the plaintiffs are precluded from asserting a claim for conversion against the defendants, as set forth in the bankruptcy court's July 2016 Opinion.  The plaintiffs' only surviving claim against Goldberg and Breslow is a claim for unjust enrichment.  But unjust enrichment is best characterized as a "quasi-contract claim," not a tort.  See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006).  Accordingly, the plaintiffs' theory for personal liability is inapposite where the plaintiffs have not shown and cannot assert that Goldberg or Breslow engaged in the commission of the tort of conversion in the course of performing their official corporate duties.

## II. **Unjust Enrichment**

The plaintiffs are also precluded from bringing their claim of unjust enrichment against the defendants because a valid and enforceable written contract governed the transaction at issue in this case.  Under New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  Nordwind

v. Rowland, 584 F.3d 420, 434 (2d Cir. 2009) (citation omitted).
"The theory of unjust enrichment lies as a quasi-contract claim.
It is an obligation the law creates in the absence of any
agreement." Beth Israel, 448 F.3d at 586 (citation omitted).  A
quasi-contractual obligation "is one imposed by law where there
has been no agreement or expression of assent, by word or act,
on the part of either party involved." Id. at 587 (citation
omitted).  Accordingly, "[t]he existence of a valid and
enforceable written contract governing a particular subject
matter ordinarily precludes recovery in quasi contract for
events arising out of the same subject matter." Id. (citation
omitted).

Here, there was a valid and enforceable contract between
R&J and Savar that governed the manufacture and shipment of Rite
Aid P.O. 4756256.  The terms of that contract were as follows:
Savar would manufacture 1,945 cases of men's socks and ship them
to Rite Aid's EC Deconsolidation Center in Chesapeake, Virginia.
In exchange, Savar would receive $114,739.44 from R&J.  Savar
shipped the requested 1,945 cases in two tranches.  Savar should
have received $87,662.11 for its shipment of the first tranche
of 1,486 cases.  This payment should have been made to Savar by
R&J but it never was.[16]

---

[16] Contrary to what the plaintiffs argue, the commercial invoice
unilaterally issued by Savar on April 6, 2010 does not

Even if the plaintiffs' claim for unjust enrichment were not precluded by the existence of a valid and enforceable contract, the plaintiffs' claim would still fail.  The plaintiffs have not provided any evidence to suggest that Goldberg or Breslow directly benefitted at the plaintiffs' expense.  Indeed, R&J's bank statements show that Rite Aid's wire transfer for $102,712.32 was deposited directly into R&J's general operating account, from which R&J paid its ordinary business expenses.  Moreover, "a plaintiff's allegation that the [defendant] received benefits, standing alone, is insufficient to establish a cause of action to recover damages for unjust enrichment."  Goel v. Ramachandran, 975 N.Y.S.2d 428, 437 (N.Y. App. Div. 2013) (citation omitted).  "Critical is that under the circumstances and as between the two parties to the transaction the enrichment be unjust."  Id. at 437-38 (citation omitted). The plaintiffs have failed to demonstrate that, as between Samad and Goldberg and Breslow, the enrichment was unjust, since the funds were received by R&J, and Goldberg and Breslow did not directly benefit from R&J's retention of money due Savar.

The plaintiffs principally argue that they had no contract with R&J for this shipment because R&J only issued one purchase

---

constitute a contract between Savar and Rite Aid.  Nor does the
Bill of Exchange issued by Exim Bank requesting $87,662.11
establish that there was a contract between Savar and Rite Aid.

order -- P.O. 700312 -- and it was for a larger amount and different assortment of goods.  The plaintiffs contend, rather, that their shipment was made pursuant to a contract between Savar and Rite Aid, and that Goldberg and Breslow were unjustly enriched when they took money from Rite Aid that was supposed to be paid directly to Savar's consignee, Exim Bank.  There are several problems with this theory.

First, the evidence is overwhelming that Rite Aid only had a business relationship with R&J, and that its shipment was made pursuant to a contract Savar had with R&J.  The plaintiffs emphasize that R&J never issued a revised P.O. to reflect the shipment of just 1,945 cases of men's socks.  While Goldberg prepared a revised production schedule for Rite Aid, he did not issue a revised version of P.O. 700312 to Savar.  Samad therefore contends that there was no contract between Savar and R&J.  The law is not so rigid as to ignore the course of dealings between the parties because of R&J's failure to clean up its paperwork.  It is well-established that not every term of a contract must be reduced to writing.  See Perry v. Sindermann, 408 U.S. 593, 601-02 (1972).  Indeed, "additional contractual provisions may be implied into a contract as a result of a course of dealing between the parties.  The parties through their conduct and practice can create additional rights and duties."  Looney v. Black, 702 F.3d 701, 716 (2d Cir. 2012)

(citation omitted); see also Schubtex, Inc. v. Allen Snyder, Inc., 399 N.E.2d 1154, 1156 (N.Y. 1979) ("[E]vidence of a trade usage or of a prior course of dealings may normally be utilized to supplement the express terms of a contract for the sale of goods." (citation omitted)).  "Evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms."  New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997).

Here, Samad would not have shipped the goods from Bangladesh to America without an expectation that he would be paid pursuant to an enforceable contract.  He had R&J's P.O. 700312 and was in constant contact with the defendants about the agreed upon revisions to that order.  All of the shipping documents refer to the R&J P.O. by its number 700312, and to R&J's master contract for this shipment by its number "STL/R&J-001/2010."  All of the email exchanges after this shipment reflect Samad's belief that R&J owed him for this and other shipments.  This is sufficient to show that there was an enforceable contract between Savar and R&J even though the purchase order was never revised to reflect the precise amount shipped.

Second, Savar did not have any contract with Rite Aid.  It is undisputed that Samad never spoke with anyone at Rite Aid and neither he nor any of his companies had a commercial

relationship with Rite Aid for any shipment at any time.  It is also undisputed that there is no Rite Aid-generated document that reflects the existence of a contract between Rite Aid and Savar.  The only documents created by Rite Aid or R&J for this transaction reflect a contract between Rite Aid and R&J for this shipment.  Nor do any of the emails between Samad and the defendants during the course of 2010 reflect anyone's understanding that Savar shipped these goods to Rite Aid pursuant to Savar's contract with Rite Aid.

Despite the absence of evidence, the plaintiffs argue that a fact finder can infer that a contract existed between Savar and Rite Aid because Rite Aid was listed on the Exim Bank Bill of Exchange.  Samad was responsible for preparing and obtaining this Bill of Exchange.  He has not produced a satisfactory explanation for how Rite Aid's name appeared on it.  While Samad may have told Exim Bank that Rite Aid would be paying Exim Bank directly, there is no evidence that Rite Aid ever made such a commitment or that Samad had any reasonable basis to expect or believe that it would.  As all of the Rite Aid, all of the R&J, and all but this one of the Savar documents indicate, Savar's contract was with R&J and Rite Aid's contract was with R&J.  Rite Aid paid R&J for the shipment, as it was obligated to do, and R&J failed to abide by its obligation to pay Savar.

<u>**CONCLUSION**</u>

Following trial, the plaintiffs' claim for unjust enrichment against Goldberg and Breslow is denied.  The Clerk of Court shall enter judgment for defendants Goldberg and Breslow on this sole remaining claim and close the case.

Dated:    New York, New York
          November 14, 2016

                              _____
                                      DENISE COTE
                              United States District Judge

29